Filed 9/16/21  Nilson v. White CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DAN NILSON et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>DANIEL M. WHITE et al.,<br><br>    Defendants and Respondents. | D077046<br><br><br><br>(Super. Ct. No. 37-2017-00016057-CU-PN-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Richard S. Whitney, Judith F. Hayes, Judges.  Affirmed.

Joshua R. Furman Law and Joshua R. Furman for Plaintiffs and Appellants.

Wingert Grebing Brubaker & Juskie, Charles R. Grebing, Ian R. Friedman; White & Amundson and Daniel M. White for Defendants and Respondents.

# I.

## INTRODUCTION

Appellants Dan and Donna Nilson appeal from a judgment entered in favor of respondents Daniel M. White and White & Amundson APC (White & Amundson) on appellants' complaint against respondents, and on White & Amundson's cross-complaint against appellants.

Appellants sued respondents over issues arising from respondents' representation of appellants in an underlying dispute involving Dan Nilson's family's farming business. Although appellants initially alleged a number of claims of misconduct by respondents during the representation period, by the time of trial, appellants' only remaining claims against respondents alleged malpractice and breach of fiduciary duties based on a stipulation entered into by respondents on appellants' behalf regarding Dan Nilson's mother's decision to move forward with a nonjudicial foreclosure on a parcel of property that appellants believed belonged to them. Appellants asserted that respondents' conduct in entering into the stipulation resulted in appellants' loss of the property in the nonjudicial foreclosure. White & Amundson cross-complained against appellants, alleging that appellants continued to owe them hundreds of thousands of dollars in attorney fees and costs, as well as interest on those amounts.

After the conclusion of appellants' case-in-chief at the jury trial, the trial court granted nonsuit on appellants' complaint, concluding that appellants had failed to prove that respondents' conduct caused appellants to lose the property to nonjudicial foreclosure. White & Amundson's case for attorney fees continued to be litigated before the jury. The jury found in favor of respondents, concluding that appellants owed White & Amundson more than $650,000 in attorney fees and costs. After the trial court entered

2

judgment on both the complaint and cross-complaint, respondents sought cost-of-proof sanctions for appellants' failure to admit certain facts in response to requests for admission propounded to appellants during discovery. The trial court granted respondents' motion for cost-of-proof sanctions in the amount of $211,032.50, and amended the judgment to include that award.

Appellants raise four broad categories of claims of error on appeal. With respect to the trial court's grant of nonsuit on appellants' complaint, appellants contend that the court incorrectly concluded that appellants were unable to demonstrate that their damages were caused by respondents' alleged malpractice in stipulating to a 60-year statute of limitations with respect to the nonjudicial foreclosure, and in waiving any timeliness defenses to the nonjudicial foreclosure.

With respect to that portion of the judgment awarding respondents damages pursuant to the cross-complaint, appellants contend that the trial court erred in excluding opinion testimony of F. Thomas Hovore, the attorney they retained after White & Amundson withdrew from representing them, on the reasonableness and necessity of the fees charged by respondents. Appellants also contend that the trial court erred in excluding evidence that they believed would demonstrate that their fee agreement with White & Amundson was subsequently orally modified to extend the due date for any attorney fees until the resolution of the underlying matter, and in declining to instruct the jury with CACI No. 313, as requested, regarding modification of a written agreement through an oral agreement or conduct.

Finally, appellants challenge a number of aspects of the trial court's order granting cost-of-proof sanctions. Appellants contend that the award of any sanctions was an abuse of the court's discretion because the evidence

3

demonstrated that appellants were justified in not admitting the matters at issue. They further argue that the court erred in determining the amount of costs to be awarded to respondents because respondents failed "to segregate the alleged costs incurred for each of the six requests." In connection with this argument, appellants contend that the amount by which the court reduced the cost-of-proof sanction award with respect to request for admission No. 34, which the court determined had been properly denied, was arbitrary. These errors, they suggest, require reversal of the cost-of-proof sanctions award.

We conclude that appellants have not demonstrated prejudicial error on appeal. We therefore affirm the judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

1. *History of the Nilson family farming enterprise*

Dan's father and mother, Charles and Louise Nilson, farmed several parcels that they owned in Imperial Valley. Charles[1] and Louise had three children—Henry, Rebecca, and Dan, all of whom at some point participated in the family farming business, Nilson Associates.[2]

Charles generally oversaw the family businesses. When Charles died in 2009, Dan and Rebecca continued operating the farm. Henry resigned from the family businesses, but maintained a limited interest in the family properties. Rebecca and Dan split income and expenses for Nilson

---

[1] For clarity, we refer to certain individuals by their first names.

[2] Separate from Nilson Associates, the family also purchased and rented farm equipment through another family company, Skona, Inc.

4

Associates, with Dan generally handling the farming and Rebecca handling the financial side of the business.

In 2013, Dan indicated to Rebecca that he wanted to reduce the amount of time that he spent working in the farming business. They attempted to determine the value of Dan's interests in the farming businesses so that he could withdraw from some of the day-to-day farming responsibilities and instead pay Nilson Associates "to have the work done" by its employees. According to Dan, during the course of these discussions, Dan and his wife Donna Nilson began to suspect that there had been accounting irregularities. By 2014, Dan was accusing Rebecca and her son of mismanagement of the businesses, mishandling funds, and fraud. After being informed of Dan and Donna's allegations, Louise amended the Charles and Louise Nilson Family Trust to remove Dan as trustee. Louise also modified Dan's inheritance such that assets that would otherwise have been distributed to Dan would instead be held in trust for him and ultimately distributed to his children.

As of late January 2014, Rebecca created a new entity, to which all of the income from Nilson Associates was diverted.

2. *The home on Sandalwood Drive*

Dan Nilson purchased a home on Sandalwood Drive in El Centro (the Sandalwood property) in the spring of 1994 with a loan of $93,138.75 from Charles Nilson. The terms of the loan were set forth in a note that was secured by a deed of trust. The note called for monthly payments of $1,000 commencing on May 28, 1994, at an interest rate of .645 percent calculated monthly, until the loan was paid in full. The note was not recorded, but the deed of trust was.

At trial, Dan testified that the family's practice with respect to the repayment of personal loans was that Charles would withhold money that

5

was otherwise due to Dan from his earnings from the family farming businesses.[3]

While the family dispute over the farming businesses was ongoing, appellants decided that they wanted to sell the Sandalwood property. In March 2014, appellants received an offer of $190,000. In the process of attempting to finalize the sale, a title report identified that the deed of trust in favor of Charles Nilson had not been removed from the title to the property. As a result, the sale was not completed.

3. *Appellants retain White & Amundson to represent them in the family dispute*

Appellants retained White & Amundson to represent them with respect to the family dispute, and signed a written Legal Services Retainer Agreement in June 2014. Appellants paid respondents a $25,000 fee deposit. The scope of services included representing Dan in his dispute with Rebecca and Ryan, which involved questions of financial accounting, misuse, misapplication of funds and ownership of Nilson Associates and Skona. White & Amundson gathered information, filed a lawsuit in July 2014, participated in pretrial mediation, conducted a Phase I trial, and engaged in a subsequent mediation. White & Amundson also moved for, and obtained, a temporary restraining order against Rebecca and her son to prevent them from disposing of funds from the businesses. Respondents filed three lawsuits on behalf of appellants.

At the end of 2014, appellants informed respondents that they could no longer afford to pay respondents for their representation. Attorney White

---

[3] The trial court sustained hearsay objections to Dan's attempt to testify that his father accepted this method of repayment for the loan on the Sandalwood property. However, Dan was permitted to testify that it was his understanding that the note had been paid off according to this arrangement.

6

agreed to continue to represent appellants in the underlying dispute and to defer appellants' obligation to pay his bills on a monthly basis. At trial, White explained that he agreed to continue to represent appellants because he was "not going to let Rebecca Nilson grind these people up and spit them out. . . . I wasn't going to tolerate it, period."

Respondents' billing administrator continued to send appellants invoices for attorney fees and costs incurred after this point in time, but indicated in an e-mail sent to appellants that the invoices were "informational so that you are kept in the loop of work being done on your matter." The billing administrator further indicated that the law firm "realize[d that] we have exhausted the trust fund monies and will await resolution of this matter before expecting payment."[4]

### 4. *The negotiations and stipulation regarding the Sandalwood property*

Louise, as trustee of the Nilson Family Trust, became holder of the note and beneficiary of the deed of trust after Charles's death. In a December 2015 letter, Louise's lawyer informed appellants that "[t]he principal loan amount on the note is $93,138.75. The interest payable under the note is 7.75% per anum [*sic*]. The loan under the note is to be paid in installments of $1,000.00 on the 28th day of each month, beginning May 28, 1994 until paid in full. Dan Nilson never made any payments on the note." The attorney indicated that Louise's position was that "the total amount due on the note is $492,156.82" and that "[i]f the past due amount is not paid, then Louise Nilson will instruct the trustee to exercise the power of sale and proceed with

---

[4]     Dan referenced a "trust fund" during his testimony at trial; he explained that he was referring to the money appellants paid as a retainer fee, which was initially $25,000 but ultimately totaled $40,000, and which had been placed in a trust account.

a non-judicial foreclosure on the property." Appellants' response, if any, is not in the record on appeal. However, on January 11, 2016, Louise's attorney confirmed in a letter to appellants that Louise would agree to participate in mediation of "all outstanding family disputes," including the unpaid note for the loan for the Sandalwood property, if Dan and the other family members would stipulate to attend a mediation regarding all of the outstanding issues.

In a separate letter dated that same day, Louise's attorney specifically addressed the Sandalwood property. The attorney indicated that Louise would agree to "refrain from recording the notice of default" on the unpaid note, which was scheduled to be recorded on January 21, 2016, if Dan would agree to do the following by January 19, 2016:

> "1. Dan Nilson pays $1,366.69 to this office [as reimbursement for amounts paid to commence foreclosure proceeding].
>
> "2. Dan Nilson stipulates that the statute of limitations applicable to the non-judicial foreclosure proceeding by the trustee under the power of sale under the trust deed associated with the April 28, 1994 note is established under C.C. 882.020 and is 60 years from the date of recordation of the trust deed.
>
> "3. Dan Nilson stipulates that he waives any defenses as to the non-judicial foreclosure proceeding under the trust deed associated with the April 28, 1994 note, to the extent that such defenses relate to the statute of limitations, laches or the timeliness of the non-judicial foreclosure.
>
> "4. The above-referenced parties all stipulate to attend mediation before an identified mediator, the first mediation to take place by March 15, 2016 to reasonably address all outstanding family legal disputes (see list below)[.]
>
> "[¶] . . . [¶]

"Thereafter, Louise Nilson will continue stand down on the foreclosure, as long as meaningful settlement negotiations referenced above remain ongoing."

Respondents forwarded this letter to appellants. Initially, Donna indicated to respondents that Dan would not accept Louise's offer.

White wrote to appellants, stating that he felt that they would not be "giv[ing] up any legal rights which you would otherwise have in defense to the nonjudicial foreclosure" if they were to agree to Louise's offer. After a telephone call with Donna explaining that the stipulation asked appellants to give up something that "the law already granted" and that it was "little more than a lawyer trying to ensure that he had dotted his 'Is' and crossed his 'Ts,' " White recorded in his notes that "Donna stated she understood, really seemed to do so and advised that she would share the information with Dan."

At trial, the parties disputed whether appellants ever gave respondents approval to agree to Louise's proposed stipulation. Appellants contended that they never gave their approval, while White contended that he received appellants' approval to enter into the stipulation. It is undisputed that the record contains no written approval from appellants.

It is also undisputed that White executed the stipulation on behalf of appellants and forwarded the $1,366.69 requested by Louise's attorney. White & Amundson billed appellants for this expense.[5]

Formal signed stipulations were e-mailed to Donna on January 20, 2016.[6] Appellants did not indicate to respondents after they presumably

---

[5]     The record does not disclose that appellants paid the bill.

[6]     In fact, three substantively identical signed stipulations were sent to Donna because a document identifying the terms of the stipulation had to be

9

received this e-mail that they had not agreed to the terms of the stipulation, or that respondents should not have agreed to the terms of the stipulation on appellants' behalf.

On April 13, 2016, appellants authorized respondents to make a global settlement offer, which included a condition that Louise could foreclose on the Sandalwood property and retain any proceeds from the sale. This offer was not revoked while respondents continued to represent appellants in the underlying family dispute.

5. *The termination of respondents' representation of appellants and foreclosure on the Sandalwood property*

On May 4, 2016, respondents received an e-mail from Donna in which she raised issues with several of respondents' April 2016 billing entries. Donna stated, "I think you can understand why our confidence is gone."

On May 6, White wrote a disengagement letter to appellants, and provided them with instructions regarding the things that new counsel would have to do, including the following:

> "[O]ur withdrawal means that settlement negotiations will be suspended. . . . Your new lawyer should immediately address this with [Louise's attorney] to determine if Louise will continue to defer the foreclosure. If [Louise's attorney] refuses to further deter foreclosure, your new counsel may wish to consider an application for injunctive relief."

Appellants, through their new attorney F. Thomas Hovore, filed a Substitution of Counsel on June 13, 2016. Also on June 13, respondents received, via certified mail, "a Notice of Default and Election to Sell Under Deed of Trust with respect to the . . . Sandalwood Drive, El Centro, California property" (Notice of Default) that had been initiated by Louise in her capacity

---

filed in each of the three pending cases involving the family disputes. We will refer to a single "stipulation."

as Trustee of the Charles and Louise Nilson Family Trust. That same day, White forwarded the Notice of Default to appellants with a letter stating: "[W]e will not represent you on this and are notifying the sender to direct future correspondence to you." White also forwarded the information by e-mail to Hovore on June 14, 2016.

Hovore testified at trial that his office did nothing to attempt to delay or prevent the nonjudicial foreclosure. At some point, Louise completed the nonjudicial foreclosure and appellants lost any right to the Sandalwood property.

B. *Procedural background*

Appellants filed a complaint against respondents claiming legal malpractice and breach of fiduciary duty, and seeking declaratory relief. The complaint as originally framed alleged several acts of alleged malpractice and breaches of fiduciary duty, including allegations related to claims that White & Amundson mishandled money held in trust; failed to pursue relevant discovery; failed to take depositions; failed to pursue appellants' damages claims; hired improper expert witnesses; had a conflict of interest based on a claimed personal relationship with opposing counsel; and allowed the foreclosure of the Sandalwood rental property.

Respondents answered the complaint, and White & Amundson filed a cross-complaint for the attorneys' fees that it claimed appellants owed.[7]

The parties engaged in discovery, and after the disclosure of the parties' experts, the parties entered into a stipulation in which appellants agreed to withdraw virtually all of their claims for malpractice and breach of fiduciary duty, with the exception of those claims relating to the foreclosure

_____

[7]    A few months later, White & Amundson filed an amended cross-complaint that became the operative cross-complaint.

of the Sandalwood property.[8]  Appellants also agreed to withdraw certain affirmative defenses to the cross-complaint ("numbers 9, 11, 13, 14, 18 and 29"), and indicated that their other "affirmative defenses, while not subject to an agreement to withdraw, generally relate to the reasonableness and necessity of the fees, costs, and expenses incurred by the Cross-Complainant and/or any of the experts retained during the course of the Cross-Complainant's representation of Cross-Defendants, as well as any and all general defense to claims for breach of contract and common counts."

Immediately prior to trial, respondents brought multiple motions in limine.  Relevant to the issues raised by appellants in this appeal, in respondents' motion in limine No. 1, respondents sought to exclude expert opinion testimony to be offered by appellants' current retained counsel, F. Thomas Hovore, to the extent that he would offer nonpercipient expert opinion testimony, and respondents' motion in limine No. 4, in which respondents sought to exclude evidence that "there was any oral or un-signed amendment, modification or waiver of the terms of the Legal Services Retainer Agreement" that the parties had executed in 2014.[9]

---

[8]  During arguments regarding motions in limine, counsel for appellants indicated that the underlying case had, for the most part, settled, and that there was only a single remaining malpractice claim and breach of fiduciary duty claim, which involved the allegations that "ha[d] to do with the handling of this foreclosure [of the Sandalwood property]."

[9]  Respondent's motion in limine No. 4 argued that evidence of an oral agreement constituted inadmissible parol evidence, and also argued that the Legal Services Retainer Agreement included a provision that required that any modification, amendment, change, or waiver be made in writing and signed by the parties.

12

The trial court tentatively granted respondents' motion in limine No. 1, precluding Hovore from providing nonpercipient expert witness testimony on the ground that appellants had not provided respondents with a declaration as to the content of his proposed testimony, as required by statute.[10] The court also tentatively granted motion in limine No. 4, without prejudice, to preclude evidence to the effect that the Legal Services Retainer Agreement had been modified by a subsequent oral agreement.[11]

A jury trial commenced on June 19, 2019. On July 2, 2019, after multiple days of testimony, respondents moved for nonsuit on appellants' remaining claims. The court granted the nonsuit that same day. As a result of the trial court's rulings, the only claims that remained for the jury to determine were White & Amundson's claims for breach of contract and common counts related to the attorney fees that White & Amundson was seeking from appellants.

Appellants requested that the trial court instruct the jury with CACI No. 313, regarding the modification of a written agreement through an oral agreement or by conduct. The trial court denied the request.

The jury returned a verdict on White & Amundson's contract claim against appellants in favor of White & Amundson, awarding the firm $650,000 in attorney fees.

The trial court entered a "Final Judgment" (some capitalization omitted) in favor of respondents on both of appellants claims against

---

[10] The parties have not cited to any portion of the record to indicate that the trial court deviated from its initial tentative ruling granting motion in limine No. 1.

[11] Although the trial court left open the possibility of "additional briefing" on this issue as trial progressed, the record on appeal does not demonstrate that the parties filed further briefing on this issue.

respondents, as well as on White & Amundson's claims against appellants, on August 23, 2019.

Approximately two weeks later, on September 11, 2019, White & Amundson filed a motion seeking cost-of-proof sanctions against appellants for failing to admit the truth of matters in their responses to requests for admission, which respondents proved at trial.

Appellants filed a timely notice of appeal from the judgment on December 10, 2019.

On January 3, 2020, the trial court granted White & Amundson's motion for cost-of-proof sanctions in the amount of $211,032.50. Appellants filed a timely notice of appeal from the court's postjudgment order granting sanctions.[12]

## III.

## DISCUSSION

A.  *The trial court did not err in granting nonsuit*

Appellants contend that the trial court erred in granting respondents' motion for nonsuit after the presentation of appellants' case at trial. They argue that the trial court misunderstood the applicable law, including the Marketable Record Title Act, and as a result, incorrectly concluded that appellants were unable to prove the element of causation with respect to their claims. Appellants maintain that the "other grounds in the [respondents'] nonsuit motion are meritless" (boldface and some capitalization omitted).

---

[12]  The trial court entered an amended judgment on January 10, 2020, to incorporate the cost-of-proof sanction award.

14

1. *Legal standards*

A motion for judgment of nonsuit is a motion made after the plaintiff's opening statement, or after the plaintiff has presented his or her evidence. (Code Civ. Proc., § 581c, subd. (a).)  The motion concedes the truth of the facts asserted (if the motion is made after the opening statement) or shown (if the motion is made after the presentation of the plaintiff's evidence), but claims that they fail as a matter of law to support the plaintiff's cause of action. (*Gray v. Kircher* (1987) 193 Cal.App.3d 1069, 1071.)  "A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by [the] plaintiff is insufficient to permit a jury to find in his favor."  (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.)

"A motion for nonsuit allows a defendant to test the sufficiency of the plaintiff's evidence before presenting his or her case.  Because a successful nonsuit motion precludes submission of plaintiff's case to the jury, courts grant motions for nonsuit only under very limited circumstances.  [Citation.] A trial court must not grant a motion for nonsuit if the evidence presented by the plaintiff would support a jury verdict in the plaintiff's favor.  [Citations.] [¶] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses.  Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded.  The court must give "to the [plaintiff's] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in [plaintiff's] favor . . . ." ' [Citations.]"  (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838–839 (*Carson*).)

"In an appeal from a judgment of nonsuit, the reviewing court is guided by the same rule requiring evaluation of the evidence in the light most

15

favorable to the plaintiff. 'The judgment of the trial court cannot be sustained unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.' [Citations.] [¶] Although a judgment of nonsuit must not be reversed if plaintiff's proof raises nothing more than speculation, suspicion, or conjecture, reversal is warranted if there is 'some substance to plaintiff's evidence upon which reasonable minds could differ . . . .' [Citations.]" (*Carson, supra*, 36 Cal.3d at p. 839.)

Appellants' only remaining claims at the time of trial were for legal malpractice and breach of fiduciary duty arising from White's alleged failure to "take action to prevent foreclosure of" the Sandalwood property, as well as his alleged "affirmative steps that allowed the foreclosure to take place, resulting in the loss of the property." Appellants claimed that White had "waived the time bar, paid claiming family members money (billing [appellants] for the expense), and told [appellants] he had acted despite their instructions," and that, as a result of White's actions, "family members were able to foreclose on the trust deed and [appellants] lost the property."

Causes of action for legal malpractice and breach of fiduciary duty both require a plaintiff to prove that the alleged breach of a duty caused the plaintiffs' damages. (See, e.g., *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 [the generic elements of a tort claim are "wrongdoing, causation and harm"]; see also *Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 833 [" 'The elements of a cause of action in tort for professional negligence' " include " 'a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence' "]; *Wittenberg v. Bornstein* (2020)

16

50 Cal.App.5th 303, 312, fn. 7 [the elements of a cause of action for breach of fiduciary duty include "damage proximately caused by that breach" of duty].)

## 2. *Analysis*

### a. *Appellants cannot, as a matter of law, demonstrate the element of causation with respect to their claim for attorney professional negligence*

To prevail on a legal malpractice claim, "the plaintiff must establish that *but for* the alleged negligence of the defendant attorney, the plaintiff would have obtained a more favorable judgment or settlement in the action in which the malpractice allegedly occurred." (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1235, 1241.) This standard requires that a plaintiff "prove what the better outcome would have been." (*Marshak v. Ballesteros* (1999) 72 Cal.App.4th 1514, 1518.) "It is not enough for [a plaintiff] to simply claim . . . that it was possible to obtain a better settlement or a better result at trial. The mere probability that a certain event would have happened will not furnish the foundation for malpractice damages." (*Barnard v. Langer* (2003) 109 Cal.App.4th 1453, 1461.)

The " 'causation inquiry has two facets: whether the defendant's conduct was the "cause in fact" of the injury; and, if so, whether as a matter of social policy the defendant should be held legally responsible for the injury.' " (*Kumaraperu v. Feldsted* (2015) 237 Cal.App.4th 60, 68.) For "causation in fact" the conduct must be a "substantial factor" or conduct bringing about harm that "is 'recognizable as having an appreciable effect in bringing it about.' " (*Ibid.*)

Even assuming that respondents breached a duty owed to appellants by entering into the stipulation in which they agreed to a 60-year statute of limitations as well as to the waiver of timeliness defenses, including laches, without appellants consent, in order to prevail, appellants would have had to

17

establish that respondents' entering into the stipulation brought about the nonjudicial foreclosure. We conclude that appellants did not make that showing.

> i. *A 60-year limitation period applied; therefore, a stipulation to that limitation period could not have caused harm to appellants*

Appellants contend that a ten-year statute of limitations in the Marketable Record Title Act, rather than the 60-year limit to which respondents stipulated, applied to the enforcement of the deed of trust and that respondents failed to establish that the ten-year statute did not apply. Specifically, appellants argue that there was "no evidence upon which the jury could determine whether the note was recorded," and, if the note was recorded, the ten-year statute of limitations would apply.

The applicable statute of limitations for enforcement of a deed of trust is governed by the Marketable Record Title Act. A lien, and with it an accompanying power of sale provided for in a deed of trust, expires either: (1) ten years after the final maturity date of the obligation or date of the final fixed payment, if that information is "ascertainable from the recorded evidence of indebtedness"; (2) 60 years from the recording date of the security instrument if the maturity date is not "ascertainable from the recorded evidence of indebtedness"; or (3) ten years after a notice of intent to preserve the security interest is recorded, but only if such notice is filed within the appropriate time limitations set forth above. (Civ. Code, § 882.020. subd. (a).) The expiration of the lien renders it unenforceable by any means. (Civ. Code, § 882.030.)[13]

---

[13] Prior to the enactment of the Marketable Record Title Act in 1982, "California cases had continuously held that the power of sale under a deed of trust was not barred, or 'never outlaws,' and that the power of sale might be

Pursuant to the statutory scheme, in order for the ten-year limitation period to apply to preclude any judicial or nonjudicial action on a lien, the "recorded evidence of indebtedness" must expressly state the maturity date or the date of the final fixed payment. (Civ. Code, § 882.020, subd. (a).) The legislative history of the statute demonstrates that the term " ' "recorded evidence of indebtedness" ' " is " 'synonymous with deed of trust.' " (*Schmidli v. Pearce* (2009) 178 Cal.App.4th 305, 315, 316.) Even where a party has "actual notice of the date when an underlying obligation is due," this is insufficient to meet the terms of Civil Code section 882.020, subdivision (a) because the "*recorded document* must reveal that date." (*Trenk v. Soheili* (2020) 58 Cal.App.5th 1033, 1039–1044, italics added [unrecorded note that specified "36 monthly payments of $2,500" was insufficient to state when an obligation is due pursuant to the terms of relevant statutory provision because "document stating the last date for payment of the underlying obligation must be *recorded* for the 10-year period to apply"].)

If a recorded deed of trust or other contemporaneously recorded document fails to state the maturity date or the date for a final fixed payment of the debt, "the maturity date of the obligation is not ascertainable from the record and the lien on the collateral property expires 60 years after recordation of the deed." (*Miller, supra*, 26 Cal.App.4th at p. 1709.) "[T]he term 'ascertainable from the record' does not include the contents of unrecorded documents referred to in a recorded document." (*Nicolopulos v. Superior Court* (2003) 106 Cal.App.4th 304, 310 (*Nicolopulos*); see *Miller, supra*, 26 Cal.App.4th 1703 [the reference to or attempted incorporation of unrecorded documents, such as a note, do not render the maturity date of

exercised by the trustee who held the title even though the statute of limitations had barred any action on the debt." (*Miller v. Provost* (1994) 26 Cal.App.4th 1703, 1707 (*Miller*).)

19

debt underlying a recorded deed of trust ascertainable because the unrecorded documents do not put the public on notice of that date].)

The only recorded document in the record in this case is the deed of trust. The deed of trust "irrevocably grants, transfers and assigns to Trustee in Trust, with Power of Sale[,]" the Sandalwood property. There is nothing in the Deed of Trust that indicates the maturity date of the underlying debt. Further, the only copy of the promissory note entered in evidence does not show any recording stamp. Other evidence in the record demonstrates that only the deed of trust, and not the promissory note, was recorded.[14] In essence, there was *no* evidence presented at trial from which a fact-finder could determine that the promissory note was recorded, or that any other document with an ascertainable maturity date for the debt was recorded.[15]

In their opening brief, appellants assert that respondents failed to establish that Civil Code section 2911 did not apply to limit the time within

---

[14] An acknowledgment signed and dated by a notary indicates that the notary certified the signature of Dan Nilson on a single document, the Deed of Trust, for recording. In addition, a title report admitted in evidence included only recordation of the deed of trust, and no recordation of a promissory note.

[15] Appellants' argument that "there was no evidence upon which the jury could determine whether the note was recorded" is unavailing. The question on a nonsuit is whether "the evidence *presented by the plaintiff* would support a jury verdict in the plaintiff's favor. [Citations.]" (*Carson, supra*, 36 Cal.3d at p. 838, italics added.) Appellants had the burden to demonstrate in their case-in-chief that respondents' conduct caused them harm. Appellants therefore had to present evidence from which a fact-finder could find that the 60-year limitation period for nonjudicial foreclosure on the Sandalwood property did not apply, and that instead, the ten-year period applied. The absence of any evidence on this point precludes appellants from being able to prove their claim.

which Louise could have quieted title to the property. Appellants suggest that Civil Code section 2911's limitation of the time frame during which title could be quieted would have allowed appellants to retain "possession" of the Sandalwood property, regardless of the applicability of the 60-year limitation period in the Marketable Record Title Act.[16] Appellants assert that "but for the waiver by [respondents], [appellants] could have maintained possession of the Sandalwood House despite any application of the Marketable Record Title Act because the ostensible foreclosers were powerless to quiet title." Civil Code section 2911 states in relevant part: "A lien is extinguished by the lapse of time within which, under the provisions of the Code of Civil Procedure . . . . [¶] 1. An action can be brought upon the principal obligation." Appellants rely on *Robin v. Crowell* (2020) 55 Cal.App.5th 727, but this authority makes clear that a trustee may conduct a nonjudicial foreclosure through the power of sale within the limitations period set forth in the Marketable Record Title Act, despite the fact that the time period for bringing an action to enforce the lien has expired. *Robin* states: "Civil Code section 2911 has been interpreted to extinguish only the lien of the deed of trust, i.e., the security interest enforceable through judicial foreclosure, *and not the power of sale*. [Citation] Consequently, the phrase '[u]nless the lien of a . . . deed of trust . . . [in Civil Code section 882.020] has earlier expired pursuant to Section 2911]' refers to the expiration of the statute of limitations on a *judicial* action to enforce the lien. The effect of Civil Code section 882.020 is to (1) *limit the time within which the trustee can exercise of the power of sale, which is unaffected by Civil Code section 2911*, and (2) set an outside limit on the time to bring a judicial action, in the event the basic

---

16    Appellants do not make further argument in this regard in their reply brief.

statutory limitations period has been extended or tolled (such as, by waiver, agreement of the parties, partial payment, or the defendant's absence from the state) and Civil Code section 2911 has not yet barred a judicial action. [Citation.]" (*Robin, supra*, 55 cal.App.5th at p. 750, italics added.) Here, because the foreclosure that occurred was a *nonjudicial* foreclosure conducted through the exercise of the power of sale, Civil Code section 2911 could not have assisted appellants in preventing the foreclosure sale.

> ii. *Despite appellants' claims otherwise, a laches defense was not available to them; thus, any waiver of such a defense could not have caused appellants' asserted harm—i.e., loss of the property*

Although a laches defense might potentially be available under the Marketable Record Title Act in the context of a judicial foreclosure, we agree with the court in *Nicolopulos, supra*, 106 Cal.App.4th 304, 312, that it is at best unclear that the equitable defense of laches may be used in the context of a nonjudicial foreclosure. " 'Laches is an unreasonable delay *in asserting an equitable right*, causing prejudice to an adverse party such as to render the granting of relief to the other party inequitable.' " (*Id.* at p. 312, quoting *Wells Fargo Bank v. Bank of America* (1995) 32 Cal.App.4th 424, 439, italics added.) Laches, therefore, is available as a defense to a lawsuit by a plaintiff seeking equitable relief. A trustee exercising a right of the power of sale pursuant to a deed of trust to execute a nonjudicial foreclosure is not asserting an equitable right in a judicial forum. There is thus no authority to support the idea that a "laches defense" could have prevented Louise from exercising the power of sale in the Deed of Trust and conducting a trustee's sale.

Appellants suggest that courts have "permitted equitable claims in defense of a nonjudicial foreclosure." However, the authorities that

22

appellants cite indicate that courts have permitted trustors to bring judicial actions for declaratory and injunctive relief in an attempt to forestall a nonjudicial foreclosure (see *Pfeifer v. Countrywide Home Loans, Inc.* (2012) 211 Cal.App.4th 1250, 1268, 1281) or to undo a completed trustee sale (see *Fonteno v. Wells Fargo Bank, N.A.* (2014) 228 Cal.App.4th 1358, 1369), *not* that an individual may bring equitable claims to "defend" against a nonjudicial foreclosure process.  Further, such a contention misses the point as to why laches cannot apply in the context of a nonjudicial foreclosure.  The issue is not that equitable defenses or claims are never available to those attempting to prevent or overturn a trustee's sale, but rather, that laches is an equitable defense *to an equitable claim brought in a judicial forum*.  (See, e.g., *Highland Springs Conference & Training Center v. City of Banning* (2016) 244 Cal.App.4th 267, 288 (*Highland Springs*) ["[a]n action on a judgment is an action at law, and the defense of laches may not be raised in actions at law, including an action on a judgment"]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1088 [laches may be asserted only in a suit in equity; *United States Capital Corp. v. Nickelberry* (1981) 120 Cal.App.3d 864, 867–868 [the defense of laches may not be raised in actions at law, but only actions in equity]; *Pratali v. Gates* (1992) 4 Cal.App.4th 632, 644–645 [same].) A trustee's sale is not an equitable claim against which a laches defense would be cognizable.

However, even if we were to assume that a laches defense was somehow applicable to prevent a trustee's sale, more than mere delay on the part of the foreclosing party must be demonstrated in order for laches to apply.  (See *Lam v. Bureau of Security & Investigative Services* (1995) 34 Cal.App.4th 29, 36 [delay alone ordinarily does not constitute laches because a lapse of time is separately embodied in statutes of limitation].)  To

23

establish laches as an affirmative defense, the party asserting it must demonstrate *both* unreasonable delay by the party bringing suit against them, *and* also " 'either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay.' [Citation.]" (*Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624 (*Miller*); *Mt. San Antonio Community College Dist. v. Public Employment Relations Bd.* (1989) 210 Cal.App.3d 178, 188.)

A party asserting laches bears the burden of production and proof on each element of the defense (*Miller, supra*, 27 Cal.3d at p. 624), and "[p]rejudice is never presumed; rather it must be affirmatively demonstrated by the defendant in order to sustain his burdens of proof and the production of evidence on the issue." (*Ibid.*)[17] Further, prejudice in this context requires a demonstration that " ' " 'the assertion of a claim available some time ago would be "inequitable" in light of the delay in bringing that claim . . . [and the] defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed.' " ' " (*George v. Shams-Shirazi* (2020) 45 Cal.App.5th 134, 142.) For example, a defendant can establish prejudice by showing detrimental reliance on the status quo. (*Brown v. State Personnel Bd.* (1985) 166 Cal.App.3d 1151, 1162.)

Therefore, in order to demonstrate that laches was an available defense and that it would have been successful, thereby allowing appellants to prevent the nonjudicial foreclosure of the Sandalwood property, appellants would have had to either put forth evidence demonstrating that they changed

---

[17] As one court explained, "Though it may seem fair and reasonable to presume prejudice based solely on a party's unreasonable delay in asserting a right, particularly when, as here, the relevant facts were known to or should have been discovered by the party asserting the right, prejudice simply may not be presumed based solely on an unreasonable delay in asserting the right." (*Highland Springs, supra*, 244 Cal.App.4th at p. 283.)

their position with respect to the Sandalwood property in a way that they would not have done if Louise had not waited to institute the nonjudicial foreclosure, or present affirmative evidence of Louise's acquiescence in Dan's failure to make the monthly payments due under the note.  On appeal, appellants do not address these issues, and do not cite to the record to demonstrate where they introduced evidence of the necessary showing of prejudice or acquiescence.  In the absence of such evidence, we cannot presume prejudice.  (See *Miller, supra*, 27 Cal.3d at p. 624.)  Given the absence of any showing with respect to these elements of a laches defense, appellants cannot demonstrate that the trial court erred in granting nonsuit with respect to their claim for attorney malpractice based on respondents' waiving of a possible laches defense, even if the court were to presume that laches is available as a defense to a nonjudicial foreclosure.

> iii.  *Appellants have not set forth any theory as to how nonsuit was granted in error with respect to their malpractice claim based on waiver of any general "timeliness" defense*

Although the stipulation at issue with respect to appellants' malpractice claim also generally waived any "timeliness" defenses to the nonjudicial foreclosure, appellants did not put forward any legal theory of a "timeliness" defense other than laches.  Absent any argument on this ground, we conclude that appellants have forfeited any contention that the nonsuit was granted in error with respect to the malpractice claim on the theory that respondents improperly waived any "timeliness" defense.

> iv.  *Appellants forfeited any contention that the granting of the nonsuit was erroneous on the ground that respondents' malpractice caused appellants harm in the amount of $1,366.69, due to respondents' payment of this amount to Louise as part of the agreement for*

25

*her to delay moving forward with the nonjudicial foreclosure*

For the first time in their reply brief, and in response to what appellants refer to as a "passing argument" made by respondents in their brief, appellants assert that "[a]t a minimum, even without considering the waiver issue, [appellants] were damaged in the amount of [the $1,366.69] payment [that respondents made to Louise to delay the foreclosure] because Respondents passed it on to [appellants] as a charge." Appellants have forfeited this issue by failing to raise the issue in their opening brief, and by failing to present reasoned argument supported by citations to the record and relevant authorities in support of this contention.

Appellate courts generally do not consider arguments raised by appellants for the first time in a reply brief. (See, e.g., *Raceway Ford Cases* (2016) 2 Cal.5th 161, 178; *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11.) Although the fact that respondents briefly addressed this issue in their brief mitigates some of the unfairness to the respondent that can result when an appellant raises an argument for the first time in a reply brief, we nevertheless conclude that forfeiture of the contention should apply because of the dearth of reasoned argument on the point offered by appellants. Appellants devoted only five sentences to this contention in their reply,[18] and they failed to support their contention with relevant legal authority and reasoned argument, all of which supports a determination that this contention has been forfeited. (See *Tsasu LLC v. U.S. Bank Trust, N.A.* (2021) 62 Cal.App.5th 704, 714 [where party did not raise challenge in opening brief on appeal and "devoted only one paragraph to it in its reply brief," party's "decision not to present reasoned argument in support of" its

---

18     One of these five sentences consisted of a single word: "Nonsense."

26

challenge constituted "a waiver of that challenge"]; see also *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 (*Cahill*) [arguments not supported by " ' "reasoned argument and citations to authority" ' " results in forfeiture]; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 (*Marriage of Falcone*) ["The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived"].)

> b. *For the same reasons appellants cannot demonstrate the element of causation as a matter of law with respect to their claim for attorney professional negligence, they cannot demonstrate causation on their claim for breach of fiduciary duty based on the same alleged conduct*

"The breach of fiduciary duty can be based upon either negligence or fraud [or another intentional violation of the duty] depending on the circumstances. [Citations.] It has been referred to as a species of tort distinct from causes of action for professional negligence [citation] and from fraud [citation]." (*Ash v. North American Title Co.* (2014) 223 Cal.App.4th 1258, 1276.) "The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, breach of fiduciary duty, and damages." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)

Although respondents contend that appellants' remaining breach of fiduciary duty claim is based on negligent conduct rather than intentional conduct, they acknowledge that the parties disputed this issue at trial. The standard of causation for a breach of fiduciary duty based on intentional conduct may be different from the standard applicable where the breach is based on negligent conduct; at least one court has identified the standard applicable to an alleged breach of a fiduciary duty based on intentional conduct as requiring a showing only that the defendant's conduct was a "substantial factor" in the harm that is alleged to have resulted from that

27

conduct rather than a "but for" cause as is required for a breach based on negligent conduct. (*Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1095; see *Knutson v. Foster* (2018) 25 Cal.App.5th 1075, 1094 (*Knutson*).) Pursuant to this standard, "[i]t is plaintiff's burden to establish ' "a reasonable basis for the conclusion that it was more likely than not that the conduct of the defendant was a substantial factor in the result." ' " (*Stanley, supra,* 35 Cal.App.4th at p. 1095.)[19] We can assume for purposes of this appeal that appellants' claim for breach of fiduciary duty is based on intentional conduct, because the result is the same, regardless of whether the causation standard is "substantial factor" causation for intentional conduct or "but for" causation for negligent conduct. This is because, as we have previously explained, the stipulation to a 60-year statute of limitation, as well as the waiver of a laches defense or other so-called "timeliness" defense that appellants have not identified, did not give Louise any additional rights with respect to moving forward with the nonjudicial foreclosure on the Sandalwood property. In view of our conclusions above, the stipulation did not eliminate any available defenses to the nonjudicial foreclosure that appellants would have had in the absence of the stipulation. Thus, respondents' conduct with respect to the stipulation simply could not have been a "substantial factor" in appellants' loss of the Sandalwood property to nonjudicial foreclosure.

---

[19] As the *Knutson* court explained: "The authors of the Restatement Third of the Law Governing Lawyers recognized that causation for intentional breach of fiduciary duty might be treated differently from negligent breach: 'Under generally applicable fiduciary law, a claim of *intentional breach* might render applicable different defenses and causation and damages rules than would otherwise control.' [Citation.]" (*Knutson, supra,* 25 Cal.App.5th at p. 1094.)

c. *The grant of nonsuit with respect to the punitive damages request was proper*

In what amounts to essentially a throw-away argument, appellants suggest that the trial court erred in granting nonsuit with respect to their request for punitive damages. Appellants contend that "[respondents'] argument that punitive damages was not supported [does not] have any merit" because, according to appellants, "[a]n attorney disobeying a direct instruction from the attorney's client in knowing disregard of the clients' rights warrants punitive damages." However, it has long been understood that " '[a]ctual damages must be found as a predicate for exemplary damages' "; "punitive damages are never more than an incident to a cause of action for actual damages, and, when allowed, are allowed only in addition to recovered actual damages." (*Mother Cobb's Chicken Turnovers, Inc. v. Fox* (1937) 10 Cal.2d 203, 205–206; 6 Witkin, Summary of Cal. Law (11th ed. 2017) Torts, § 1780 ["it is settled in California that punitive damages cannot be awarded unless actual damages were suffered, the theory being that they are in addition to compensatory damages"].) Thus, a punitive damage request falls when a court grants a nonsuit as to the cause of action supporting the actual damages that provide the predicate for the punitive damage request. Because the trial court properly granted nonsuit as to appellants' causes of action seeking actual damages, the court also properly granted nonsuit with respect to appellants' claim for punitive damages.

d. *Appellants have not demonstrated reversible error with respect to their declaratory relief claim*

Appellants assert, without any legal argument, that although "[t]he nonsuit motion also argued that the declaratory relief claim was derivative and should be dismissed along with the other claims," this argument is

29

"meritless" because "[t]he declaratory relief claim sought a declaration that the Nilsons did not owe White any more money," and this "claim is not extinguished even if White was correct that the breach of fiduciary duty claim could not go to the jury." This is the extent of appellants' argument with respect to their cause of action for declaratory relief and whether the trial court properly granted nonsuit on that cause of action.

Again, the failure to support a contention with " ' "reasoned argument and citations to authority" ' " results in forfeiture of the contention on appeal. (See., e.g., *Cahill, supra*, 194 Cal.App.4th at p. 956; *Marriage of Falcone, supra*, 164 Cal.App.4th at p. 830.) Appellants have failed to support their contention regarding the court's grant of nonsuit with respect to the declaratory relief claim with any argument, let alone reasoned argument. Further, the record makes clear that appellants could not demonstrate that the trial court *prejudicially* erred in granting nonsuit as to their declaratory relief claim. Although we agree with appellants that their declaratory relief claim is not derivative of either the attorney malpractice claim or the breach of fiduciary duty claim, appellants had a full and fair opportunity to try all of the issues raised in their declaratory relief cause of action; respondents' entire cross-complaint concerned respondents' contention that appellants were liable for additional monies due to respondents, which is the same issue that appellants raise in their declaratory relief claim.[20] Appellants' raised a

_____

[20] In their declaratory relief claim, appellants asserted that there existed "an actual controversy between Plaintiffs and Defendants as to whether Plaintiffs owe significant sums to Defendants for legal services rendered." Appellants further asserted that "[d]ue to Defendants' ethical violations, overbilling, unnecessary billing, and other misconduct, as well as principles of accord and satisfaction, novation, and other doctrines of contract and equity, Plaintiffs should not be liable to Defendants for any additional monies." Appellants sought a declaration that they owed no more money to

variety of defenses to respondents' claims in their answer to the cross-complaint, including defenses related to matters referenced in appellants' declaratory relief claim—including respondents' alleged breaches of ethical obligations, attorney negligence, unclean hands, waiver, breach of contract, accord and satisfaction, novation, and lack of or failure of consideration. Most important, the parties *actually litigated* all of the issues raised in appellants' declaratory relief cause of action—i.e., whether respondents' conduct and/or alleged misconduct prevented respondents from obtaining any further monies from appellants, whether respondents' billings were unnecessary or unreasonable, and whether contractual principles otherwise rendered appellants not liable for further attorney fees and costs associated with respondents' representation of appellants in the underlying family dispute litigation.  It is therefore clear that appellants were not prejudiced by the court's grant of nonsuit with respect to their declaratory relief cause of action.

B. *Appellants have demonstrated no basis for reversing the jury's verdict in favor of respondents on respondents' cross-complaint for unpaid attorney fees*

Appellants do not directly attack the validity of the jury's verdict in favor of respondents on respondents' contractual claim for unpaid attorney fees, but instead challenge two aspects of the trial court's pretrial rulings. First, appellants contend that the trial court erred in not permitting them to call their attorney, whom they hired to represent them after the attorney-client relationship with respondents terminated, to testify as to "the reasonableness and necessity of White's claimed fees."  The trial court

---

respondents.  Although all three claims may have relied to some extent on the same evidence, this cause of action is distinct from appellants' causes of action for attorney malpractice and breach of fiduciary duty.

31

excluded such testimony on the ground that appellants had not included a declaration as to the content of their attorney's proffered testimony, which is required with respect to retained experts.

Second, appellants contend that the trial court erred in ruling that evidence of the existence of an alleged oral modification of the written legal services agreement between the parties constituted inadmissible parol evidence. They further contend that the trial court's misunderstanding of the nature of the evidence as parol evidence led the court to engage in instructional error by declining to instruct the jury with CACI No. 313, regarding subsequent modification of a written agreement, as requested by appellants.

1. *The trial court did not abuse its discretion in not permitting appellants to call their subsequently-retained attorney to testify regarding the reasonableness of the fees claimed by respondents*

Appellants contend that the trial court prejudicially erred in granting respondents' motion in limine No. 1, which had the effect of precluding appellants' second attorney in the underlying family dispute matter, Hovore, from providing nonpercipient expert witness testimony. The trial court's ruling was based on the fact that appellants had not provided respondents with a declaration as to the content of Hovore's proposed testimony, as is required by statute with respect to retained-expert testimony. The trial court stated, "Well, the tentative is to grant this motion. There hasn't been a designation that he'll be providing us with testimony. There has been no declaration outlining what the proposed expert testimony would be. [¶] Now, to the extent that he's allowed to testify as a percipient witness attorney remains to be seen. I haven't heard his testimony. I don't know what the questions and answers are going to be. But at this point, on the various

32

issues that are addressed in this case, I'm not inclined to allow him to testify as an expert. He can certainly testify as to what he did as an attorney."

At trial, while Hovore was testifying on direct examination, counsel for respondents objected to some of Hovore's statements regarding things that Hovore believed White had not done, but should have, during his representation of appellants in the underlying proceeding, as violating the trial court's in limine ruling regarding expert testimony. The attorneys and the court discussed the matter of the limitation on Hovore's testimony further and the court repeatedly reaffirmed its earlier tentative ruling that Hovore would not be permitted to testify as a legal expert with respect to issues surrounding the standard of care and/or the value or reasonableness of respondents' services and fees. At one point, the court explained, "One of the problems is if Mr. Hovore was a plumber, this was a plumber business, he can testify as to what he's done. As a professional licensed lawyer, it's hard for him, on this subject, from what I've heard, to give any testimony without giving an expert opinion. That's the problem which leads us back to [where we are]. He probably should have been, at some point, designated as an expert."

After further discussion, the trial court again indicated its concern about the testimony that appellants' counsel wanted to elicit from Hovore and the likelihood that counsel would veer into expert opinion territory. When appellants' counsel asked, "Are we allowed to present facts that show why the fee claim is problematic? Are we allowed to meet the facts at all?" the court responded, "How do you do that without discussing and rendering expert opinions? I don't know how any expert does that. In a personal injury case you can't have a physician go on the stand and, without appropriate designation of expertise, testify how another physician's fees are

33

unreasonable and unnecessary. There's just no way around it. That's why we have evidentiary laws that apply to it. He can testify as to his diagnosis, as to his prognosis, as to his course of treatment, but that's the problem we're having with this witness's testimony."

After further argument, the trial court ultimately stated, "So here's what I'm going to do. I'm going to allow Mr. Hovore's testimony to continue, the risk being that if none of his testimony is relevant or has any bearing on this case and the objections continue to come in and they continue to be sustained, then there's the risk that his testimony is stricken -- so as long as you're aware of that -- at the conclusion of it. I don't know if that will happen or not, but I just want to make sure you're aware of that so you can appropriately weigh that, because right now I'm not seeing the relevancy of his testimony based on what I've heard. And I want to bring the jury in, I'll allow him to continue, and we'll see where it goes."

Hovore continued to testify as to his percipient observations regarding his work as appellants' attorney in the underlying matter. His testimony comprised approximately 61 pages of transcript.

We review a trial court's ruling on the admissibility of expert testimony for an abuse of discretion. (*Mateel Environmental Justice Foundation v. Edmund A. Gray Co.* (2003) 115 Cal.App.4th 8, 25.) A trial court's discretion to make evidentiary rulings "is abused only when in its exercise, the trial court 'exceeds the bounds of reason, all of the circumstances before it being considered.' [Citation.] . . . A trial court will abuse its discretion by action that is arbitrary or ' "that transgresses the confines of the applicable principles of law." ' [Citations.]" ((*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281.)

California law distinguishes between retained experts and nonretained or "independent" experts. Code of Civil Procedure section 2034.210, subdivision (a), applies to both types of experts, and provides that "[a]ny party may demand a mutual and simultaneous exchange by all parties of a list containing the name and address of any natural person, including one who is a party, whose oral or deposition testimony in the form of an expert opinion any party expects to offer in evidence at the trial."

Code of Civil Procedure section 2034.210, subdivision (b), applies to retained experts, and provides that if an expert designated under subdivision (a) "is a party or an employee of a party, or has been retained by a party for the purpose of forming and expressing an opinion in anticipation of the litigation or in preparation for the trial of the action, the *designation of the witness shall include or be accompanied by an expert witness declaration under Section 2034.260*." (Italics added.) The expert witness declaration under Code of Civil Procedure section 2034.260, subdivision (c), must be signed by the attorney for the party designating the expert, if the party is represented by an attorney, and must contain the following: "(1) A brief narrative statement of the qualifications of each expert. [¶] (2) A brief narrative statement of the general substance of the testimony that the expert is expected to give. [¶] (3) A representation that the expert has agreed to testify at the trial. [¶] (4) A representation that the expert will be sufficiently familiar with the pending action to submit to a meaningful oral deposition concerning the specific testimony, including any opinion and its basis, that the expert is expected to give at trial. [¶] (5) A statement of the expert's hourly and daily fee for providing deposition testimony and for consulting with the retaining attorney."

Nonretained, independent experts must be listed on the expert designation, but nothing more than the expert's name and address is required. (Code Civ. Proc., §§ 2034.210, subd. (a), 2034.260, subd. (b)(1); see *Schreiber v. Estate of Kiser* (1999) 22 Cal.4th 31, 35 (*Schreiber*).)

Code of Civil Procedure section 2034.300 provides in relevant part that "on objection of any party who has made a complete and timely compliance with Section 2034.260, the trial court shall exclude from evidence the expert opinion of any witness that is offered by any party who has unreasonably failed to . . . [¶] (b) Submit an expert witness declaration."

Appellants contend that "the law in California has long been that a percipient witness may offer professional opinions which the witness is qualified to offer without complying with the requirements of section 2034.260, subdivision (c)," and that " '[f]or such a witness, no expert witness declaration is required, and he may testify as to any opinions formed on the basis of facts independently acquired and informed by his training, skill, and experience.' (*Schreiber v. Estate of Kiser* (1999) 22 Cal.4th 31, 39.)" They contend that Hovore was designated as a nonretained expert witness in this case, and that, as such, Hovore should have been permitted to testify not only as to "the state of the file that he received," but also to "the value of the services that had been performed by White prior to Hovore's retention."[21] According to appellants, they were not required to submit a declaration regarding Hovore's opinion about the value of the services that White & Amundson had provided because he was, effectively, similar to a treating physician who may provide not only percipient witness testimony, but may

___

[21] Appellants appear to be challenging as prejudicial error only the trial court's exclusion of Hovore's opinions regarding the reasonableness and necessity of respondents' billings, and not the exclusion of his opinions regarding the standard of care with respect to professional negligence.

also provide " 'opinions formed on the basis of facts independently acquired and informed by his training, skill, and experience.' "  According to appellants, Hovore "has all the expertise required to form opinions, and his involvement with the Underlying Matter was more than adequate to provide a basis for his opinions."

Appellants rely on *Schreiber, supra*, 22 Cal.4th at p. 39 to argue that because Hovore could have testified as to "any opinions formed on the basis of facts independently acquired and informed by his training, skill, and experience," he should have been permitted to provide his opinion as to the reasonableness of respondents' fees.  *Schreiber* is instructive.  The question before the *Schreiber* court was "whether a treating physician becomes a 'retained' expert within the meaning of [the predecessor provision to Code of Civil Procedure section 2034, subdivision (b)], requiring the submission of an expert witness declaration, whenever the physician gives opinion testimony." (*Id.* at p. 34.)  As the court explained, a treating physician generally does not fall into one of the categories of expert witnesses to which the declaration requirement applies—"i.e., those who are parties, employees of parties, or are 'retained by a party for the purpose of forming and expressing an opinion in anticipation of the litigation or in preparation for the trial . . . .' [Citations.]" (*Id.* at pp. 34–35.)

In reaching the conclusion that a treating physician may provide opinion testimony as part of his or her percipient witness testimony, the Supreme Court identified the distinguishing feature that sets a treating physician apart from a typical retained expert:  "A treating physician is a percipient expert, but that does not mean that his testimony is limited only to personal observations.  Rather, like any other expert, he may provide both fact and opinion testimony.  As the legislative history clarifies, *what*

37

*distinguishes the treating physician from a retained expert is not the content of the testimony, but the context in which he became familiar with the plaintiff's injuries that were ultimately the subject of litigation, and which form the factual basis for the medical opinion. . . .* A treating physician is not consulted for litigation purposes, but rather *learns of the plaintiff's injuries and medical history because of the underlying physician-patient relationship.*" (*Schreiber, supra*, 22 Cal.4th at p. 35, italics added.) The context in which the testifying expert witness came to know the facts underlying his or her opinion is, in fact, the main distinction between a nonretained expert and a retained expert.

The *Schreiber* court repeatedly highlighted the fact that the *source* of the information forming the factual basis of a treating physician's opinions is relevant to the question whether a treating physician may provide opinion testimony without being considered to be a "retained" expert. (See *Schreiber, supra*, 22 Cal.4th at pp. 38 ["[*B*]*ecause [treating physicians] acquire the information that forms the factual basis for their opinions independently of the litigation*, they are subject to no special discovery restrictions" (italics added)], 39 ["[T]o the extent a physician *acquires personal knowledge of the relevant facts independently of the litigation*," there is no need for an expert witness declaration and that physician "*may testify as to any opinions formed on the basis of facts independently acquired and informed by his training, skill, and experience*" (italics added)].) It is thus clear that for purposes of determining whether a designated expert witness is to be considered to be a "retained" expert, thus requiring a declaration, a trial court must consider whether that witness acquired the facts necessary to the expert's opinion independent of the litigation at issue.

38

At trial, appellants made no proffer that Hovore's opinions as to the reasonableness of respondents' fees and billings that appellants sought to elicit would be based *solely* on his knowledge of the case based on his representation of plaintiffs in the underlying family dispute.[22]  Indeed, there is nothing in the record that suggested to the trial court that Hovore would have possessed or reviewed White & Amundson's billings as part of his representation of appellants in the underlying matter, or that he was privy to White & Amundson's internal billing decisions, or the amount of time that White & Amundson attorneys and staff spent on various matters.  Thus, there was nothing to indicate that Hovore could have offered any informed opinion based solely on "facts independently acquired" through his representation of appellants in the underlying case about the reasonableness of the fees billed by respondents or the necessity of the services rendered for which fees were billed.  The testimony that appellants suggest they should have been permitted to elicit from Hovore regarding the reasonableness of respondents' billings is similar to a portion of a treating physician's testimony that the court in *Dozier v. Shapiro* (2011) 199 Cal.App.4th 1509, 1518 (*Dozier*) concluded constituted "retained" expert testimony, despite the fact that the testimony was elicited from a treating physician.  Specifically, the *Dozier* court concluded that the plaintiff in that case had not "substantially compl[ied] with the code requirements for expert witness designation" because the plaintiff had failed to disclose the substance of a treating doctor's

---

[22]    In their reply, plaintiffs appear to suggest that respondents bore some burden to provide evidence that Hovore "did review such outside documents or assisted [plaintiffs']" "preparation for trial in this legal malpractice action." However, when the admissibility of proffered evidence is dependent upon the existence of some preliminary fact, it is the proponent of that proffered evidence who has the burden of producing evidence of the preliminary fact. (Evid. Code, § 403.)

anticipated opinion testimony that was formed based on "information received after [the treating physician's] deposition and not wholly from his status as [the plaintiff's] treating physician." (*Id.* at p. 1518, bolding and some capitalization omitted.) As the *Dozier* court explained, "The issue here is not whether an expert witness declaration is necessarily required when a treating physician testifies as an expert; it is not. [Citation.]" (*Id.* at p. 1520.) This is because "[a] treating physician is not consulted for litigation purposes, but rather is qualified to testify about the plaintiff's injuries and medical history because of his or her underlying expertise as a physician and his or her physician-patient relationship with the plaintiff. A retained expert, on the other hand, is engaged for the purpose of forming and expressing an opinion in anticipation of the litigation *based at least in part on information obtained outside the physician-patient relationship, for the purpose of the litigation rather than the patient's treatment.* [Citation.]" (*Ibid.*, italics added.)

The *Dozier* court concluded that the plaintiff was entitled to present the treating physician's testimony "as an expert on the basis of the facts he had learned and opinions he had formulated in connection with his physician-patient relationship and treatment of [the plaintiff]." (*Dozier, supra,* 199 Cal.App.4th at p. 1520.) However, the plaintiff's counsel in *Dozier* sought to elicit opinion testimony from the treating physician based on additional materials, including records that the treating physician had not examined during the course of his treatment of the plaintiff. (*Id.* at p. 1521.) The *Dozier* court concluded that, at the point where the treating physician's opinion was no longer based solely on what he had learned during the physician-patient relationship, the treating physician was "transformed . . . into a retained expert." (*Ibid.*) As the *Dozier* court explained, "[W]hen

40

Dr. Zeegen received additional materials . . . to enable him to testify to opinions about [the defendant's] adherence to the standard of care—a subject on which he had [stated during his deposition that he had] formed no opinions in connection with his physician-patient relationship with Mr. Dozier [and required additional records in order to be able to do so]—his role was not that of a treating physician, but became that of a retained expert. And as Dr. Zeegan was a retained expert, Dozier was required to disclose the information called for in [Code of Civil Procedure] section 2034.210, subdivision (b), including a summary of the substance of Dr. Zeegan's anticipated testimony. ([Code Civ. Proc.,] § 2034.210, subd. (b).)" (*Dozier, supra*, at p. 1521.) The *Dozier* court concluded that the trial court had "correctly determined that Dr. Zeegan's trial testimony on the subject of the standard of care would be that of a retained expert rather than merely a treating physician," and that the court "was justified in precluding him from testifying to opinions he had formed for the litigation, including his opinions on the subject of [the defendant's] compliance with the standard of care." (*Ibid.*)

Similarly, in this instance, the trial court correctly understood that, to the extent Hovore's opinions about the value of respondents' services and the reasonableness of their billings were not formed in the course of his representation of appellants in the underlying litigation[23] but instead would have required that he obtain additional information—i.e., information other than what he would glean solely through his representation of appellants— such opinions would veer into "retained" expert territory for which a

_____

[23] Appellants have offered nothing to suggest that an attorney taking over the representation of a client in a dispute would have any need to consider the reasonableness or necessity of prior counsel's billings of that client in the matter as part of his or her representation of the client.

declaration is required under Code of Civil Procedure section 2034.210, subdivision (b).  In the absence of the requisite declaration, respondents were not provided fair notice of appellants' intention to elicit from Hovore his opinions about matters beyond those based solely on his representation of the clients in the underlying matter.  This lack of fair notice undermines the purpose of the expert witness disclosure requirements, and provided good cause for the trial court to exclude Hovore's opinions as to the reasonableness of respondents' billings.  (See *Easterby v. Clark* (2009) 171 Cal.App.4th 772, 780 [" '[T]he very purpose of the expert witness discovery statute is to give fair notice of what an expert will say at trial. . . .' "  " '[W]hen an expert is permitted to testify at trial on a wholly undisclosed subject area, opposing parties . . . lack a fair opportunity to prepare for cross-examination or rebuttal' "].)

Appellants do not challenge the trial court's implicit finding that their failure to comply with the code by providing a declaration outlining the general substance of the testimony that Hovore was expected to provide was unreasonable.  (See Code of Civ. Proc., § 2034.300 [trial court "shall exclude from evidence the expert opinion of any witness that is offered by any party who has *unreasonably* failed to" provide the required expert witness declaration (italics added)].)  Appellants have thus forfeited any challenge to the trial court's ruling on this basis.  (See, e.g., *Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862 ["Appellate briefs must provide argument and legal authority for the positions taken. 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived' "].)

We therefore conclude that appellants have not demonstrated that the trial court abused its discretion in determining that, because appellants did not submit the required declaration, Hovore's testimony regarding the reasonableness and necessity of respondents' billings in the underlying matter would be excluded.

2. *Appellants have not demonstrated reversible error with respect to the trial court's exclusion of evidence of a purported oral modification of the written Legal Services Retainer Agreement or the court's failure to instruct the jury with CACI No. 313*

Appellants contend that the trial court abused its discretion in excluding evidence of a purported oral agreement modifying the terms of the parties' Legal Services Retainer Agreement (Retainer Agreement). They further contend that this erroneous evidentiary ruling led the court to commit instructional error by failing to instruct the jury with CACI No. 313, as requested by appellants.[24]

---

24     CACI No. 313 provides:

> "[Name of party claiming modification] claims that the original contract was modified or changed. [Name of party claiming modification] must prove that the parties agreed to the modification. [Name of other party] denies that the contract was modified.

> "The parties to a contract may agree to modify its terms. You must decide whether a reasonable person would conclude from the words and conduct of the parties that they agreed to modify the contract. You cannot consider the parties' hidden intentions.

> "[A contract in writing may be modified by a contract in writing.]

> "[A contract in writing may be modified by an oral agreement to the extent the oral agreement is carried out by the parties.]

43

A trial court's ruling on an in limine motion is generally reviewed for an abuse of discretion. However, review is de novo when the issue is one of law. (*Condon–Johnson & Associates, Inc. v. Sacramento Municipal Utility Dist.* (2007) 149 Cal.App.4th 1384, 1392.)

Respondents moved to exclude evidence of any purported oral agreement between the parties on the ground that such evidence would constitute inadmissible parol evidence. Appellants argued that the parties entered into an oral agreement once appellants' $25,000 fee deposit for the litigation in the family dispute was depleted, thereby modifying the Retainer Agreement. According to appellants, the parties orally agreed that respondents would continue to work on the case, and that appellants would not be required to pay respondents' bills until the resolution of the underlying matter. The trial court agreed with respondents that evidence of a purported oral agreement constituted parol evidence, and excluded any evidence of the purported oral agreement on this ground. Given this ruling, the court denied appellants' request to instruct the jury with CACI No. 313.

The plaintiffs were seeking to admit evidence of a *subsequent* oral modification, not evidence of a prior or contemporaneous oral agreement. Thus, the evidence of a purported oral modification of the Retainer Agreement was not parol evidence. (See *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1174; see also *Marani v. Jackson* (1986) 183 Cal.App.3d 695, 699, fn. 2 [parol evidence

---

"[A contract in writing may be modified by an oral agreement if the parties agree to give each other something of value.]

"[An oral contract may be modified by consent of the parties, in writing, without an agreement to give each other something of value.]"

44

rule excludes only extrinsic evidence of prior or contemporaneous oral agreements, not evidence of subsequent oral agreements].)  This is not the end of the analysis, however.

"If evidence is excluded on an improper objection but the evidence excluded is subject to objection on a different ground, it does not matter that the reason advanced by counsel or relied upon by the court was wrong. [Citations.]  If the exclusion is proper upon *any theory of law applicable* to the instant case, the exclusion must be sustained regardless of the particular considerations which may have motivated the trial court to its decision." (*Philip Chang & Sons Associates v. La Casa Novato* (1986) 177 Cal.App.3d 159, 173, italics added; *Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1278 ["although the trial court excluded evidence of Hospital's service specific costs for the wrong reason, the result was correct"]; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 347, pp. 398–399.)  We conclude that the exclusion of the evidence in question was proper, albeit on grounds different from those that the trial court relied on. As a result, we further conclude that the court did not err in declining to instruct the jury with CACI No. 313.

As both parties note, Civil Code section 1698 governs the manner by which a written agreement may be modified.  In addition to noting that a written agreement may be modified by a separate written agreement (Civ. Code, § 1698, subd. (a)), the statute provides that a written contract may be modified by an oral agreement (1) to the extent that the oral agreement is "executed by the parties" (Civ. Code, § 1698, subd. (b)), or (2) where the written contract does not indicate that it cannot be modified by an oral agreement, to the extent that the oral agreement is supported by consideration and the statute of frauds is satisfied where applicable (Civ.

45

Code, § 1698, subd. (c)).[25]  The Law Revision Commission comment to Civil Code section 1698 observes:  "The rules provided by subdivisions (b) and (c) merely *describe cases where proof of an oral modification is permitted*; these rules do not, however, affect in any way the burden of the party claiming that there was an oral modification to produce sufficient evidence to persuade the trier of fact that the parties actually did make an oral modification of the contract."  (Italics added.)

In response to respondents' contention that the purported oral agreement to modify the written Retainer Agreement was not "executed" for purposes of Civil Code section 1698, subdivision (b), appellants argue in their reply briefing that the oral agreement was in fact "executed by the parties" and that subdivision (b) of the provision therefore applies to render the evidence in question admissible.  We disagree with appellants on this point.

---

[25]    Civil Code section 1698 provides in full as follows:

"(a) A contract in writing may be modified by a contract in writing.

"(b) A contract in writing may be modified by an oral agreement to the extent that the oral agreement is executed by the parties.

"(c) Unless the contract otherwise expressly provides, a contract in writing may be modified by an oral agreement supported by new consideration.  The statute of frauds (Section 1624) is required to be satisfied if the contract as modified is within its provisions.

"(d) Nothing in this section precludes in an appropriate case the application of rules of law concerning estoppel, oral novation and substitution of a new agreement, rescission of a written contract by an oral agreement, waiver of a provision of a written contract, or oral independent collateral contracts."

Generally, the term "executed" means that an agreement "must be fully performed *on both sides*." (*Lockheed Missiles & Space Co. v. Gilmore Industries, Inc.* (1982) 135 Cal.App.3d 556, 559, italics added; see Civ. Code, § 1661 ["An executed contract is one, the object of which is fully performed"].) Appellants argue that the evidence demonstrates that the parties "conducted themselves in comportment with the oral modification" over a period of approximately 15-months, and that this demonstrates that the purported modification was "executed." However, according the appellants, the performance required of them pursuant to the purported oral modification was their payment of respondents' bills upon resolution of the underlying matter. It is undisputed that appellants have not performed their obligation under the terms of the purported oral modification. As a result, the oral modification cannot be said to have been fully performed, and therefore cannot be considered to have been "executed by the parties" (Civ. Code, § 1698, subd. (b)). We therefore conclude that the evidence was not admissible as evidence of an oral agreement to modify a written contract pursuant to Civil Code section 1698, subdivision (b).

The parties also dispute whether the evidence at issue could have been admissible pursuant to Civil Code section 1698, subdivision (c). Respondents argue that there was no consideration for a purported modification of the Retainer Agreement because "[a] promise to do something one is already bound to do cannot constitute consideration needed for a binding contract." Appellants dispute respondents' contention that any purported oral modification was not supported by consideration and was therefore not admissible under Civil Code section 1698, subdivision (c). Appellants have the better position in this respect. The purported oral agreement was not simply an agreement to allow appellants to delay

47

payment for work that respondents had already completed.  Rather, the agreement, according to appellants, was that respondents would continue to represent appellants and to bill additional hours for work on the underlying case in exchange for appellants' agreement to pay for that work upon the resolution of the underlying case.  Under this theory, respondents obtained something of value in exchange for their agreement to a delay in payment, i.e., the opportunity to incur more billable hours, for which they would be entitled to additional payment, beyond what was already due at the time of the purported modification.

However, as respondents note, under subdivision (c) of Civil Code section 1698, "a written contract can be modified by oral agreement only if supported by new consideration, '[u]*nless the contract otherwise expressly provides*.' "  Respondents identify language in the Retainer Agreement that prohibits modification of the written agreement by anything other than another written and signed agreement.  Specifically, the Retainer Agreement includes an integration provision that requires that any modification be in writing and signed by the party against whom enforcement of the purported modification is sought:  "This Retainer Agreement contains the entire agreement between Clients and Law Firm relating to representation of Clients in Clients' case, and all prior work, contemporaneous agreements, understandings, representations, and statements, whether oral or written, and whether by a party or such parties' legal representative, are merged herein.  *No modification, waiver, amendment, discharge, or change of this Retainer Agreement will be valid unless the same is in writing and signed by the party against which the enforcement of such modification*, waiver, amendment, or discharge is or may be sought."  (Italics added.)

The introductory language of Civil Code section 1698, subdivision (c)—i.e., "[u]nless the contract otherwise expressly provides"—imposes a significant limitation on the circumstances under which a nonexecuted oral modification to a written agreement may be given effect. A party may not rely on an alleged oral modification of a written agreement, even if the alleged oral modification is supported by consideration, where the written agreement provides that its terms may be modified only in writing. (See *Conley v. Matthes* (1997) 56 Cal.App.4th 1453, 1465.)[26] Because the Retainer Agreement required that any modification of its terms be in writing, appellants were not entitled to put forth evidence of an alleged oral modification of the written agreement that had not been fully executed by the parties.

The fact that the trial court properly declined to allow appellants to present evidence of a purported oral agreement modifying the terms of the Retainer Agreement means that the trial court also did not err in declining to instruct the jury with CACI No. 313, as requested by appellants, regarding how and when a written agreement may be modified by an oral agreement. A party is entitled to an instruction on a theory of the case only where that theory is supported by the pleadings and substantial evidence. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) Because the trial court properly excluded evidence of the purported oral agreement, appellants were not entitled to an instruction regarding oral modifications of written agreements.

---

26    This clearly is in contrast to a situation in which the evidence demonstrates that the terms of the oral agreement have been fully executed, as provided for in subdivision (b) of Civil Code section 1698, which does not include the "[u]nless the contract otherwise expressly provides" language that appears in subdivision (c).

49

C. *There is no basis for reversing the trial court's cost-of-proof order*

In their final challenge to the trial court's judgment, appellants assert that the court erred in a number of ways with respect to its order granting respondents cost-of-proof sanctions in the amount of $211,032.50. We address each argument, in turn.

1. *Legal standards*

Under Code of Civil Procedure section 2033.420, "[i]f a party fails to admit the genuineness of any document or the truth of any matter when requested to do so . . . , and if the party requesting that admission thereafter proves the genuineness of that document or the truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees." (*Id.*, subd. (a).) A trial court "shall make this order" unless it finds any of the following: "(1) An objection to the request was sustained or a response to it was waived . . . . [¶] (2) The admission sought was of no substantial importance. [¶] (3) The party failing to make the admission had reasonable ground to believe that that party would prevail on the matter. [¶] (4) There was other good reason for the failure to admit." (*Id.*, subd. (b).)

"Requests for admissions differ fundamentally from other forms of discovery. Rather than seeking to uncover information, they seek to eliminate the need for proof." (*Stull v. Sparrow* (2001) 92 Cal.App.4th 860, 864 (*Stull*).) " 'The primary purpose of requests for admissions is to set at rest triable issues so that they will not have to be tried; they are aimed at expediting trial. [Citation.] The basis for imposing sanctions [under section 2033.420] is directly related to that purpose. Unlike other discovery sanctions, an award of expenses . . . is not a penalty. Instead, it is designed

50

to reimburse reasonable expenses incurred by a party in proving the truth of a requested admission . . . [citations] such that trial would have been expedited or shortened if the request had been admitted.' " (*Id.* at p. 865, quoting *Brooks v. American Broadcasting Co.* (1986) 179 Cal.App.3d 500, 509 (*Brooks*).)

The party seeking to benefit from the exceptions listed in subdivision (b) of Code of Civil Procedure section 2033.420 " 'bears the burden to establish the exception.' " (*Samsky v. State Farm Mutual Automobile Ins. Co.* (2019) 37 Cal.App.5th 517, 523.) Because appellants were seeking the benefit of one or more of the exceptions in subdivision (b), they bore the burden to establish that those exceptions applied.

The determination as to whether a party is entitled to expenses under section 2033.420 is within the sound discretion of the trial court. "More specifically, 'section 2033[.420] clearly vests in the trial judge the authority to determine whether the party propounding the admission thereafter proved the truth of the matter which was denied.' " (*Stull, supra*, 92 Cal.App.4th at p. 864.) We review the trial court's determination for an abuse of discretion. (*Brooks, supra*, 179 Cal.App.3d at p. 508.)

2.  *Additional background*

Respondents sought cost-of-proof sanctions for the expenses that they incurred as a result of having to prove requests for admission Nos. 16, 17, 20, 21, 22, 34 and 35.[27] Request for admission No. 16 asked appellants to "[a]dmit the final maturity date for performance of the obligation imposed by the note between Charles and Louise Nilson Family Trust and Dan A. Nilson

---

[27] The trial court did not grant cost-of-proof sanctions with respect to request for admission No. 34, but did grant them with respect to the other requests for admission. We separately discuss requests for admission Nos. 34 and 35 in part III.C.5, *post*.

51

secured by a May 3, 1994 recorded deed of trust on the home located at . . . Sandalwood Drive in El Centro, California is not ascertainable from the recorded deed of trust."

Request for admission No. 17 asked appellants to "[a]dmit the last fixed payment date for [the] note between Charles and Louise Nilson Family Trust and Dan A. Nilson secured by a May 3,1994 recorded deed of trust on the home located at . . . Sandalwood Drive in El Centro, California is not ascertainable from the recorded deed of trust."

Request for admission No. 20 asked appellants to "[a]dmit you had thirty days after June 13,2016 to dispute the validity of the Notice of Default and Election to Sell Under Deed of Trust relating to the note between Charles and Louise Nilson Family Trust and Dan A. Nilson secured by a May 3,1994 recorded deed of trust on the home located at . . . Sandalwood Drive in El Centro."

Request for admission No. 21 asked appellants to "[a]dmit White & Amundson told you on June 13, 2016 that it would take no action with respect to the Notice of Default and Election to Sell Under Deed of Trust relating to the note between Charles and Louise Nilson Family Trust and Dan A. Nilson secured by a May 3,1994 recorded deed of trust on the home located at . . . Sandalwood Drive in El Centro, California."

Request for admission No. 22 asked appellants to "[a]dmit White & Amundson told you on June 13, 2016 that it would not represent you with respect to the Notice of Default and Election to Sell Under Deed of Trust relating to the note between Charles and Louise Nilson Family Trust and Dan A. Nilson secured by a May 3,1994 recorded deed of trust on the home located at . . . Sandalwood Drive in El Centro, California."

Request for admission No. 35 asked appellants to "[a]dmit [that] before May 4, 2016, no actual conflict of interest exi[s]ted relating to White & Amundson, APC's legal representation of Dan and Donna Nilson."

Appellants denied all of these requests for admission.

3. *The trial court did not err in granting cost-of-proof sanctions with respect to requests for admission Nos. 16, 17, 20, 21, and 22*

Appellants should have admitted requests for admission Nos. 16 and 17, given the existence of documents supporting the assertions of fact at issue in those requests for admission. Rather than concede these points, which went to the question whether the final maturity date for the obligation secured by the deed of trust was apparent from recorded documents, and thus, to the question of the timeliness requirements for a nonjudicial foreclosure on the Sandalwood property, appellants disputed them and in doing so, caused respondents to have to prove those matters. The trial regarding the foreclosure of the Sandalwood property focused on whether respondents' agreement to the stipulation in the underlying dispute to waive certain timeliness defenses was a proximate cause of appellants' loss of the property to the nonjudicial foreclosure. The question whether the maturity date was ascertainable from the record went to a central issue in the litigation of appellants' claims against respondents because if there is no maturity date or final fixed payment date on the recorded deed of trust—the only recorded document—then the 60-year statute of limitations applies. In turn, if the 60-year statute of limitation applies, respondents could not have caused appellants any harm by stipulating to a 60-year statute of limitations.

Although appellants contend that their failure to admit to facts that would have demonstrated the applicability of the 60-year statute of limitations had minimal impact because the real focus of the dispute was

53

respondents' waiver of a laches defense, in order to prevail, respondents were required to disprove *all* of the allegations set out by appellants, including the claim that respondents improperly agreed to a 60-year statute of limitations. The trial court reasonably concluded that appellants should have admitted these facts and that an admission of these facts would have expedited the trial.

Requests for admission Nos. 21 and 22 sought admissions that respondents informed appellants that respondents would take no action and would not represent appellants with respect to the Notice of Default and Election to Sell Under Deed of Trust. According to appellants, they reasonably denied these requests for admission because respondents had, in fact, taken some action on appellants' behalf by accepting notice of the letter, thereby contradicting the terms of the letter. As the trial court stated, and we agree, this is an unreasonable position. Respondents' receipt and acceptance of the Notice of Default and Election to Sell Under Deed of Trust, and their subsequent efforts to inform appellants of the Notice of Default could not be understood to reasonably indicate that respondents were continuing to represent appellants, given the express statements in the June 13, 2016 letter from respondents to appellants stating the opposite. It was clear that the receipt of the Notice of Default and Election to Sell Under Deed of Trust and the forwarding of this document to appellants was the final act that respondents were going to take on behalf of appellants. To the extent that appellants contend that requests for admission Nos. 21 and 22 were not important to a central issue at trial, again, appellants had the burden at trial to demonstrate that respondents' alleged malpractice caused harm to appellants; this required a showing that appellants would have obtained a more favorable outcome if not for respondents' actions. Although appellants

54

suggested that the foreclosure occurred "because White left," which in turn caused the "mediation and the settlement talks that had been ongoing" to "stop[ ] for a while, and in that interim, the house was foreclosed on," in point of fact, respondents expressly informed appellants that they would not be representing appellants, and indicated to appellants that their new counsel should take immediate action to address the impending foreclosure.[28] Further, although appellants still contend that "any such challenge [to the validity of the debt] would have been futile because White had already waived the grounds for a challenge," it is clear that the waiver was only as to timeliness defenses, and not to any *other* defenses that appellants may have had.[29] Again, all of these facts went to the central issue of whether respondents' acts or omissions caused appellants' harm.

Similarly, appellants had no reasonable basis for denying that they "had thirty days after June 13, 2016 to dispute the validity of the Notice of Default and Election to Sell Under Deed of Trust relating to the note between Charles and Louise Nilson Family Trust and Dan A. Nilson secured by a

---

[28] As previously noted, respondents told appellants, "[O]ur withdrawal means that settlement negotiations will be suspended. . . . Your new lawyer should immediately address this with [Louise's attorney] to determine if Louise will continue to defer the foreclosure. If [Louise's attorney] refuses to further defer foreclosure, your new counsel may wish to consider an application for injunctive relief."

[29] For example, as respondents point out in briefing, appellants had not waived a right to contest the foreclosure on the ground that the underlying debt had been satisfied. Appellants suggested that Dan had paid off the loan through deductions from his salary. As respondents note, evidence that Dan had paid off the loan through such deductions could have supported a wrongful foreclosure action against Charles's estate. However, appellants did not take any action to contest the nonjudicial foreclosure after respondents were no longer representing them.

May 3,1994 recorded deed of trust" on the Sandalwood property, as requested in request for admission No. 20. This request for admission was based on the law regarding nonjudicial foreclosure, as well as a letter that appellants received from the debt collector dated June 13, 2016, which informed them of this fact. Appellants contend that they were reasonable in disputing this request for admission because they had "90 days to challenge, not 30 days." However, this request asked them to admit that they had 30 days to challenge the validity of the debt about which the Notice of Default was being sent. The Notice of Default indicated that appellants had 30 days to dispute the validity of the debt, as provided by federal law under the Fair Debt Collection Practice Act. The Notice of Default also separately notified appellants that no sale date would be set until 90 days from the date of recording of the Notice of Default. In this request, respondents were asking appellants to admit that they had been provided 30 days to dispute the validity of the debt and default under the note pursuant to the Notice of Default.

Appellants also argue that this request was irrelevant to their claims because "[t]he issue pertaining to the Sandalwood House is not what happened on June 13, 2016 or thereafter," but rather, "what White did six months earlier on January 19, 2016, when [respondents] waived Dan Nilson's rights." This is incorrect. In order to establish that the loss of the Sandalwood property was attributable to respondents' conduct, appellants had to demonstrate that appellants lost the Sandalwood property in the nonjudicial foreclosure as a result of respondents' acts or omissions. A demonstration that appellants had 30 days after receipt of this letter to challenge the debt, and that they took no action during that time to attempt to prevent the foreclosure by challenging the validity of the debt, was

relevant to demonstrating that it was not respondents' conduct that caused appellants' loss of the Sandalwood property to nonjudicial foreclosure.

We see no abuse of the trial court's discretion in its determination that respondents were entitled to be reimbursed for costs for having to prove all of the facts that went to the question whether appellants could demonstrate that appellants' loss of the Sandalwood property was the result of respondents' conduct.

4. *The trial court did not err in determining the amount of the sanctions award*

Appellants contend that the trial court erred in "determining the amount of sanctions" (boldface and some capitalization omitted). According to appellants, "[e]vidence of costs incurred for proving each denied request must be segregated into separate amounts for each request,"

We conclude that the record supports the trial court's decision to award the amounts that respondents requested. The rule is that a party cannot recover cost-of-proof sanctions for issues that are outside the scope of the requests. (See *Assoc. for Los Angeles Deputy Sheriffs v. Macias* (2021) 63 Cal.App.5th 1007; see also *Garcia v. Hyster Co.* (1994) 28 Cal.App.4th 724, 736–737 [party cannot recover cost-of-proof sanctions for issues that are "completely outside the scope of the request for admissions"].) In *Garcia*, for example, the court noted that the amount requested as cost-of-proof sanctions for the failure to admit a number of requests for admission may have included some expenses for resources that had been devoted to issues wholly separate and distinct from the issue of employer negligence that was at the heart of the requests for admission at issue in that case. (*Garcia, supra*, 28 Cal.App.4th at pp. 736–737.) Because the *Garcia* court was already going to reverse on the ground that the cost-of-proof award covered a time period

before costs would have been permitted under the statute, the court also directed the trial court to consider whether some of the costs that had been requested were incurred in proving separate issues at trial. (*Ibid.*)

In this case, however, the main issue at trial with respect to appellants' claims against respondents was whether respondents were liable for damages to appellants arising from the loss of the Sandalwood property. Requests for admission Nos. 16, 17, 20, 21, and 22 all sought admissions of predicate facts intended to demonstrate that respondents' conduct was not the cause of appellants' loss of the Sandalwood property to the nonjudicial foreclosure. The trial court therefore reasonably concluded that all of these requests for admission were central to the single issue litigated at trial and that respondents were therefore entitled to reimbursement of the costs that they incurred for having to prove the facts at issue in the requests for admission. Contrary to appellants' contention, because all of the requests for admission went to the single issue of whether respondents could be held liable for appellants' loss of the Sandalwood property, there was no need to segregate the costs with respect to each of the individual requests. We see no abuse of discretion in the court's determination of the amount of the cost-of-proof sanctions.

   5.   *The trial court erred in awarding cost-of-proof sanctions for request for admission No. 35; however appellants were not prejudiced by this error*

Request for admission No. 35 asked appellants to "[a]dmit [that] before May 4,2016, no actual conflict of interest exi[s]ted . . . relating to White & Amundson, APC's legal representation of Dan and Donna Nilson." Appellants denied the factual basis of this request for admission. The trial court included request for admission No. 35 as a basis for the total cost-of-proof sanction award in its order.

58

The trial court concluded that appellants should have admitted request for admission No. 35 because, even though appellants had "stipulated to withdrawal of all claims and defenses related to conflicts of interest prior to trial," they had "not address[ed] the issue as an affirmative defense to the Cross-Complaint."[30]  However, as appellants note, there is no affirmative defense in the answer to the cross-complaint that specifically relies on an assertion of the existence of a conflict of interest.  The trial court was therefore incorrect in suggesting that appellants' failure to admit the lack of a conflict of interest, as requested in request for admission No. 35, was ultimately of any importance at trial.  As a result, appellants' failure to admit request for admission No. 35 could not form the basis for a cost-of-proof sanction award.

However, the record demonstrates that the trial court has already reduced respondents' cost-of-proof  sanction award by the amount that respondents claimed was required to prove requests for admission Nos. 34 *and* 35.  Respondents requested costs of proof related to requests for admission Nos. 34 and 35 jointly, arguing that the cost of proving both of those predicate facts went to the need to overcome appellants' "legal malpractice affirmative defense" to the fee agreement claim asserted by respondents.  Because the fee agreement issue raised by respondents' cross-complaint was litigated before the jury after the nonsuit was granted as to appellants' complaint, the attorney declaration filed by respondents' counsel in support of the cost-of-proof motion stated that the fees incurred by

---

30     The court's order is inconsistent in that the court appears to acknowledge that appellants stipulated to withdraw "all claims and *defenses* related to conflicts of interest," but goes on to state that appellants did not "address the issue as an affirmative defense to the Cross-Complaint."

respondents in connection with litigating "these affirmative defenses after the non-suit was granted" totaled only $6,067.

In considering respondents' cost-of-proof sanctions motion, the trial court denied any cost-of-proof sanctions for having to prove the factual matter at issue in request for admission No. 34 after concluding that appellants had a good faith basis not to admit that request for admission. The court noted that respondents had not specified how many hours had been spent on "Request[ ] for Admission number[ ] 34," and, as a result, the court reduced the overall amount requested by the full $6,067—i.e., the total amount requested by respondents with respect to both request for admission No. 34 *and* request for admission No. 35. Because the court reduced the award by the aggregate amount requested by respondents for the expenses that they incurred in proving both requests for admission Nos. 34 and 35, there is no additional amount that the trial court could deduct from its sanctions award to account for its error with respect to request for admission No. 35.[31] There is therefore no basis for reversing or modifying the court's cost-of-proof sanctions order.

---

[31] Appellants have suggested that the trial court's decision to reduce "the claimed fees" was problematic because the court did so "by an arbitrary amount." This is not so. The court declined to award respondents $6,067 of the expenses they claimed were spent proving the truth of the matters appellants denied in requests for admission Nos. 34 and 35. This was the precise amount that respondents' attorney's declaration specifically attested was spent litigating the truth of the matters at issue in those requests for admission.

IV.

DISPOSITION

The judgment is affirmed.  Respondents are entitled to their costs on appeal.

AARON, J.

WE CONCUR:

McCONNELL, P. J.

DATO, J.